**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Window Rock Unified School District, et al., | )<br>)<br>) |
| Plaintiffs, | ) No. CV-12-08059-PCT-PGR<br>) |
| vs. | )<br>) ORDER |
| Ann Reeves, et al., | )<br>) |
| Defendants. | )<br>) |

Pending before the Court are the Navajo Nation Labor Commission Defendants' Motion to Dismiss for Failure to Exhaust Tribal Remedies (Doc. 12), Plaintiffs' Cross-Motion for Summary Judgment (Doc. 27), and the employee defendants' Motion Pursuant to Rule 56(f) [sic] Fed.R.Civ.P. (Doc. #34), all of which relate to the underlying issue of whether the Navajo Nation has the regulatory and adjudicative authority to review personnel decisions made by the plaintiff school districts. Having considered the parties' memoranda, the Court finds that the defendants' motions should be denied and that the plaintiffs are entitled to the entry of summary judgment in their favor as a matter of law pursuant to Fed.R.Civ.P. 56.[1]

---

[1] While some of the defendants have requested oral argument, the Court concludes that a hearing would not significantly aid the decisional process.

Background

Plaintiffs Window Rock Unified School District and Pinon Unified School District are both Arizona political subdivisions. *See* A.R.S. § 15-101(21). Pursuant to their mandates under Arizona constitutional and statutory law to educate all Arizona children[2], they operate public schools within that portion of the Navajo Reservation located within the State of Arizona on tribal land leased from the Navajo Nation. The defendants are seven current or former employees of the plaintiffs ("employee defendants"), and seven current or former members of the Navajo Nation Labor Commission ("NNLC defendants").[3]

At the time this action was commenced, the employee defendants had complaints pending before the Navajo Nation Labor Commission ("NNLC"), a tribal administrative tribunal, wherein they alleged that the school districts had violated their employment-related rights under the Navajo Preference in Employment Act ("NPEA").[4] The school districts, the defendants in the NNLC cases, filed motions

---

[2] The Arizona Constitution requires the state legislature to enact "such laws as shall provide for the establishment and maintenance of a general and uniform public school system[.]" Ariz.Const. Art. XI, § 1.

[3] The employee defendants are Ann Reeves, Kevin Reeves, Loretta Brutz, Mae Y. John, Clarissa Hale, Michael Coonsis, and Barbra Beall. They are all enrolled members of the Navajo Nation, with the exception of Kevin Reeves, who is an enrolled member of a different tribe, and Ann Reeves, who is a non-Indian.
   The NNLC defendants are Richie Nez, Casey Watchman, Ben Smith, Peterson Yazzie, Woody Lee, Jerry Bodie, and Evelyn Meadows.

[4] NPEA, a tribal general labor code, in part requires employers operating within the Navajo Reservation to hire, promote and retain qualified Navajo tribal members ahead of non-Navajos, and to fire or discipline employees, whether Navajo or not, only for "just cause."
   The employee defendants' claims before the NNLC include claims for

with the NNLC seeking the dismissal of the complaints for lack of jurisdiction, contending that the NNLC had no regulatory or adjudicatory authority over personnel decisions made by Arizona public school districts located on the Navajo Reservation as a result of this Court's ruling in Red Mesa Unified School District v. Yellowhair, 2010 WL 3855183 (D.Ariz. September 28, 2010)[5]. After consolidating the employee defendants' complaints, the NNLC ruled that it could resolve the tribal jurisdiction issue only through an evidentiary hearing held after the parties had engaged in appropriate jurisdiction-related discovery. This action was commenced before the NNLC could hold its evidentiary hearing.

In their complaint in this action for declaratory and injunctive relief, the plaintiff school districts, who are indisputably non-Indians, allege that the NNLC and the Navajo tribal courts lack jurisdiction over public school districts' employment

---

retaliation, for failure to be hired as the most qualified Navajo applicant for a job opening, for workplace harassment, and for termination without just cause. The merits of the employee defendants' NNLC complaints are not at issue here.

[5] The Red Mesa Unified School District case involved essentially the same factual situation as here. The plaintiffs, which were two Arizona public school districts operating schools within the Navajo Reservation on land leased from the tribe, sought to prevent some current and former employees from prosecuting employment termination-related claims before Navajo administrative and judicial bodies and to prevent those bodies from adjudicating the claims. The Court, finding that the Navajo Nation had no regulatory or adjudicatory jurisdiction over the employee defendants' employment claims, enjoined the employees from further prosecuting their claims before the NNLC, the Navajo Supreme Court, or any other Navajo tribal court or administrative tribunal and enjoined the NNLC defendants from further adjudication of the employee defendants' claims. Unlike in this case, the plaintiffs in Red Mesa had sufficiently exhausted their tribal court remedies relating to the issue of tribal jurisdiction before filing their federal action. That exhaustion process resulted in the Navajo Nation Supreme Court finding that the school districts were subject to NPEA and that the NNLC had jurisdiction over the employment-related claims.

Case 3:12-cv-08059-PGR   Document 48   Filed 03/19/13   Page 4 of 20

decisions and practices conducted on the Navajo Reservation when the districts are fulfilling their state responsibilities to provide a public education for all of Arizona's children. The plaintiffs seek to have the Court prohibit the employee defendants from prosecuting their claims against the plaintiffs in either the NNLC, the Navajo Nation Supreme Court, or any other Navajo forum, and prohibit the NNLC defendants from continuing to adjudicate the claims of the employee defendants, as well as prohibit them from adjudicating any employment claims between the plaintiffs and their employees.

Discussion

The NNLC defendants, in an unenumerated Fed.R.Civ.P. 12 motion joined in by the employee defendants, seek to have this action dismissed as premature due to the plaintiffs' undisputed failure to exhaust their tribal court remedies before commencing this action; the plaintiffs have cross-moved for summary judgment pursuant to Fed.R.Civ.P. 56 on the ground that tribal jurisdiction over the employee defendants' claims against them is plainly lacking as a matter of law.[6] Complete exhaustion is mandatory before a non-Indian may bring an action in federal court challenging tribal jurisdiction unless one of four exceptions to the exhaustion rule is applicable. Elliott v. White Mountain Apache Tribal Court, 566 F.3d 842, 846-47 (9th Cir.2009). The plaintiffs invoke what is referred as the fourth exception, which provides that exhaustion of tribal court remedies is not required "when it is plain that tribal court jurisdiction is lacking, so that the exhaustion requirement would serve no purpose other than delay." *Id.* at 847 (internal quotation marks and emphasis

---

[6] The Court notes that it has intentionally discussed herein only those arguments raised by the parties that the Court considers necessary to the resolution of the pending motions.

- 4 -

omitted) (*citing to* Nevada v. Hicks, 533 U.S. 353, 369 (2001)).  In the Ninth Circuit, tribal court jurisdiction is not plainly lacking and exhaustion is required if such jurisdiction is either "plausible" or "colorable." *Id.* at 848.  The Court concludes that the plaintiffs are not required to exhaust tribal administrative or judicial remedies inasmuch as the Court possesses all of the facts necessary to make its jurisdictional determination, which is that tribal jurisdiction is plainly lacking here and that exhaustion would serve no purpose other than delay.

The Supreme Court has established that "absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." Strate v. A-1 Contractors, 520 U.S. 438, 445 (1997). The defendants, who bear the burden of establishing the existence of tribal jurisdiction, *see* Plains Commerce Bank v. Long Family Land and Cattle Co., 554 U.S. 316, 330 (2008), do not argue that any federal statute empowers the Navajo Nation with regulatory or adjudicatory over the plaintiffs' employment decisions underlying this action, and the Court is aware of none. *See* MacArthur v. San Juan County, 497 F.3d 1057, 1068 (10th Cir. 2007) ("Congress has passed no law which permits the Navajo Nation to exercise regulatory authority over nonmember entities or individuals who employ members of the tribe within the confines of the reservation; nor has it passed a broader statute which arguably encompasses nonmember employers.")

A. Jurisdiction Based on the Navajo Nation's Power to Exclude Non-Indians

The defendants' primary argument is that tribal jurisdiction over the employee defendants' NNLC claims is at least colorable because of the Navajo Nation's right to exclude non-Indians from its tribally-owned lands, which they contend arises both as a result of the Treaty of 1868 and the tribe's inherent sovereign powers.

(1) Tribal Jurisdiction Under the Treaty of 1868

The defendants initially argue that Navajo tribal civil authority over the plaintiffs' employment decisions is recognized by the Treaty of 1868, 15 Stat. 667 (1868), wherein the United States agreed in relevant part that non-authorized persons will not be permitted access to reservation lands; the defendants characterize this provision as granting the Navajos a broad right to exclude all outside persons from their reservation except a narrow subset of federal officials.[7] Their contention is that this treaty-based power to exclude non-Indians from the reservation applies to Arizona public school districts and grants the tribe the concomitant authority to impose conditions on the school districts' use of tribal land, which they assert includes requiring the school districts to comply with tribal employment-related laws and procedures. The Court is not persuaded that the treaty provision in and of itself expressly authorizes the specific tribal jurisdiction at issue here.

The Court acknowledges that the Supreme Court has interpreted the treaty's exclusion provision as implying "the understanding that the internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed." Williams v. Lee, 358 U.S. 217, 221-22 (1959). The Supreme Court, however, has also determined that a tribe's right to internal self-government has limitations imposed by Congressional action and by the implicit divestiture of

---

[7] The portion of Article 2 of the treaty relied upon by the defendants states that "the United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employees of the Government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article."

sovereignty as a result of their dependent status, the latter of which is centered around the relations between an Indian tribe and non-tribal members. *See* MacArthur v. San Juan County, 497 F.3d at 1067 (*citing to* United States v. Wheeler, 435 U.S. 313, 326 (1978)). Whatever the outer scope of the Navajo Nation's treaty-based right of exclusion may be, the Court does not believe it is expansive enough to grant tribal jurisdiction under the specific circumstances present in this case. The Navajo Nation's right to control its internal affairs is not sufficiently implicated here as this case does not involve the state's attempt to assert proprietary interest in tribal lands or broad authority over the tribe's internal affairs. Rather, it involves the plaintiffs' state-imposed duty to operate public schools, which are schools that Congress required Arizona to establish as a condition of statehood, Arizona Enabling Act, 36 Stat. 557, § 20 (1910) (mandating that Arizona provide "for the establishment and maintenance of a system of public schools which shall be open to all children of said state and free from sectarian control"), and which Congress further mandated "shall forever remain under the exclusive control" of the State of Arizona. *Id.* at § 26.

(2) Tribal Jurisdiction Under Inherent Sovereign Power to Exclude

The NNLC defendants also argue that the Navajo Nation has a federal common law right to exclude non-Indians from its reservation even if it does not have a treaty right to exclude.

In its unappealed opinion in Red Mesa Unified School District v. Yellowhair, 2010 WL 3855183 (D.Ariz. Sept. 28, 2010), the Court concluded that the Navajo Nation's regulatory and adjudicatory authority over the employment-related decisions of the plaintiff school districts was governed by the limiting principles set forth in Montana v. United States, 450 U.S. 544 (1981), and its progeny, in particular

Nevada v. Hicks, 533 U.S. 353 (2011), notwithstanding that the plaintiffs' schools were located on tribally-owned land.  In so ruling, the Court rejected the defendants' contention, which they predicated on Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982), that tribal jurisdiction over the plaintiff school districts could be predicated on the Navajo Nation's inherent authority to bar non-Indians from its tribal lands.

The NNLC defendants, citing to Water Wheel Camp Recreational Area, Inc. v. LaRance, 642 F.3d 802 (9th Cir. 2011), a decision that was issued subsequent to this Court's Red Mesa decision, argue that the Navajo Nation's jurisdiction over the plaintiffs is plausible because its sovereign right to exclude non-Indians from tribal land exists independently from the limitations on tribal authority over non-Indians recognized in Montana.  In Water Wheel, the Ninth Circuit, noting in reliance on Merrion that an Indian tribe's inherent sovereign power to exclude non-Indians from its tribal lands includes the lesser authority to set conditions on their entry through regulations, upheld an Indian tribe's civil authority to prosecute through its tribal court system an unlawful detainer action for trespass and breach of a lease of tribal land against a non-Indian corporation and its non-Indian owner operating a commercial recreational resort on tribally-owned land.  After determining that Montana does not generally affect an Indian's tribe fundamental right of exclusion as it relates to regulatory jurisdiction over non-Indians on Indian land, *id.* at 812, the Ninth Circuit concluded that "where the non-Indian activity in question occurred on tribal land, the activity interfered directly with the tribe's inherent power to exclude and manage its own lands, and there are no competing state interests at play, the tribe's status as landowner is enough to support regulatory jurisdiction without considering *Montana*."  642 F.3d at 814.  The Court concludes that Montana governs here pursuant to the exception noted in Water Wheel.

1    Recognizing that the Supreme Court in Nevada v. Hicks applied the general rule of Montana to non-Indian activity on Indian-owned land, the Ninth Circuit in Water Wheel determined that Hicks' "application of *Montana* to a jurisdictional question arising on tribal land should apply only when the specific concerns at issue in that case exist." *Id.* at 813.  Those concerns are sufficiently applicable here because there are significant competing state interests at play.

In Hicks, which involved the issue of tribal court jurisdiction over a tribal member's civil rights and tort claims filed against state officers arising from their execution of a search warrant on tribal land, the Supreme Court applied the Montana test to determine that tribal jurisdiction did not exist. In doing so, the Supreme Court determined that it was "[n]ot necessarily" correct that a tribe may make its exercise of regulatory authority over nonmembers a condition of nonmembers' entry onto to tribal land within a reservation. 533 U.S. at 359. The Supreme Court's focus in Hicks was on the nature of the state interest at issue, not the tribally-owned status of the land.[8]  Relevant to the Montana application exception noted in Water Wheel, the

---

[8]   In Hicks, the Supreme Court overturned the underlying Ninth Circuit decision, Nevada v. Hicks, 196 F.3d 1020 (9th Cir.1999), that had rejected the use of the Montana presumption against tribal jurisdiction in favor of determining that tribal jurisdiction existed because the tribe's power to exclude the state officers from Indian-owned, Indian-controlled land implied its authority to regulate the behavior of nonmembers on that land.  The Ninth Circuit's view that Montana was applicable only when the nonmembers' activities sought to be regulated occurred on non-tribal lands was rejected by the Supreme Court, which determined that Montana applied notwithstanding the Indian-owned status of the land. The Supreme Court reasoned that its precedents, including Montana, had not determined that Indian ownership of the land on which the non-Indians' activities took place suspended the general proposition that the inherent sovereign powers of the tribe do not extend to the activities of nonmembers except to the extent necessary to protect tribal self-government or to control internal relations.  Instead, the Supreme Court noted that the ownership status of land is only one factor to consider in determining the

1  Supreme Court in Hicks, noting that an Indian reservation is considered to be part
2  of the territory of the state, stated that it was clear that "the Indians' right to make
3  their own laws and be governed by them does not exclude all state regulatory
4  authority on the reservation. State sovereignty does not end at a reservation's
5  border. ... When ... state interests outside of the reservation are implicated, States
6  may regulate the activities even of tribe members on tribal land[.]" 533 U.S. at 361-
7  62.

8  What distinguishes this case from Water Wheel is that the plaintiffs here are
9  not private actors engaging in a commercial activity on reservation lands for

---

propriety of tribal regulation of nonmembers. While the Supreme Court further noted that tribal land ownership may sometimes be a dispositive factor, it concluded that "the existence of tribal ownership is not alone enough to support regulatory jurisdiction over nonmembers." 533 U.S. at 360. This principle was reiterated by the concurring opinions in Hicks, in that one stated that "it is undeniable that a tribe's remaining inherent civil jurisdiction to adjudicate civil claims arising out of acts committed on a reservation depends on the first instance on the character of the individual over whom jurisdiction is claimed, not on the title to the soil on which he acted. ... It is the membership status of the unconsenting party, not the status of the real property, that counts as the primary jurisdictional fact." *Id.* at 381-82 (Souter, J., joined by two other justices, concurring). Another concurrence stated that "the majority is quite right that *Montana* should govern our analysis of a tribe's civil jurisdiction over nonmembers both on and off tribal land." *Id.* at 388 (O'Connor, J., joined by two other justices, concurring in part.) *See also*, Atkinson Trading Co. v. Shirley, 532 U.S. 645, 559-60 (2001) ("If we are to see coherence in the various manifestations of the general law of tribal jurisdiction over non-Indians, the source of the doctrine must be *Montana*[.] ... That general principle is ... the first principle, regardless of whether the land at issue is fee land, or land owned by or held in trust for an Indian tribe.") (Souter, J., with two other justices, concurring).

economic gain; rather, they are state political entities making employment decisions in the course of their duties mandated by Arizona constitutional and statutory law to provide a public education for all children within the state. Tribal land ownership is not the dispositive factor here; as the plaintiffs correctly note, "[t]his case does not involve encroachment upon tribal land, damage to tribal land, interference with the use of tribal land, or any other effect upon tribal land that might prove dispositive." The dispositive factor is instead the fact that the state's considerable interest, arising from outside of the reservation, in providing for a general and uniform public education is very much implicated.

B. Jurisdiction Based on Montana

The defendants further argue that tribal jurisdiction is plausible even if Montana is the controlling doctrine. The Supreme Court in Hicks reiterated that "Indian tribes' regulatory authority over nonmembers is governed by the principles set forth in *Montana*[,]" which it described as the "pathmaking case on the subject." 533 U.S. at 358. Montana adopted the general rule that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." Montana, 450 U.S. at 565. As a result of this general proposition, "efforts by a tribe to regulate nonmembers ... are presumptively invalid." Plains Commerce Bank v. Long Family Land and Cattle Co., 554 U.S. at 330. In Montana, the Supreme Court recognized two narrowly-construed exceptions to its general rule of no tribal jurisdiction over non-Indians. The Court concludes that neither exception provides the Navajo Nation with civil authority over the employee defendants' employment-related decisions brought before the NNLC.

(1) First Exception

The first <u>Montana</u> exception provides that an Indian tribe may exercise some forms of civil jurisdiction over non-Indians on their reservations "through taxation, licensing, or other means ... who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements." <u>Montana</u>, 450 U.S. at 565. The defendants argue that the leases between the plaintiffs and the Navajo Nation constitute the type of consensual relationship recognized in <u>Montana</u>. The Court concludes that they do not.

In the Court's prior <u>Red Mesa Unified School District v. Yellowhair</u> case, the NNLC defendants and employee defendants raised this same contention, arguing that <u>Montana</u>'s first exception provided the Navajo Nation with civil authority over the plaintiff school districts' employment-related decisions because the school districts had consented to tribal jurisdiction through their leases allowing them to place their schools on tribal land.[9] The Court rejected that argument, finding instead that the school districts' lease-related relationship with the Navajo Nation was not the type of consensual relationship to which the first <u>Montana</u> exception applied. In making that determination, the Court focused on the government/private actor dichotomy, concluding that the first exception could not properly be extended to reach the employment-related actions of the school districts regardless of their status as tribal lessees "since both made the employment decisions at issue while operating in their governmental capacities pursuant to their state constitutionally-imposed mandate to

---

[9] The Court notes that five of the seven NNLC defendants in this case also were defendants in the <u>Red Mesa</u> case. None of the defendants appealed the Court's judgment in <u>Red Mesa</u>.

operate a public school systems within the reservation boundaries."[10]  2010 WL 3855183, at *3.

---

[10]

The Court further noted in its Red Mesa decision that

[t]his governmental/private actor dichotomy was noted in Hicks in reference to the first exception when it observed that the Montana court "obviously did not have in mind States or state officers acting in their governmental capacity; it was referring to private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by the arrangements that they ... entered into. This is confirmed by the fact that all four of the cases in the immediately following citation involved private commercial actors." Hicks, 533 U.S. at 372. ... Other courts have also recognized the distinction between private actors and government actors for purposes of Montana's first exception. *See e.g.,* MacArthur v. San Juan County, 497 F.3d at 1073-74 (In concluding that the Navajo Nation did not possess regulatory authority over employment-related claims made to the ONLR [Office of Navajo Labor Relations, a tribal administrative body] by terminated Navajo employees of a special health service district, a political subdivision of the state of Utah, the court stated that "[w]e too adhere to the distinction between private individuals or entities who voluntarily submit themselves to tribal jurisdiction and 'States or state officers acting in their governmental capacity[,]'" and concluded that the employment relationships between the state health district and its Navajo employees "were not '*private* consensual relationships' in any sense of the term and do not fall within the first *Montana* exception.") (emphasis in original); County of Lewis v. Allen, 163 F.3d 509, 515 (9th Cir.1998) (en banc) (In concluding that a tribal court had no jurisdiction over a tribal member's tort claim against a deputy sheriff for actions taken on reservation land pursuant to a state-tribal law enforcement agreement, the court determined that the agreement between the state and the tribe did not qualify as a consensual relationship of the type giving rise to tribal regulatory authority over a non-Indian because "Montana's exception for suits arising out of consensual relationships has never been extended to contractual agreements between two government entities[.]")

2010 WL 3855183, at *4.

The Court concludes that its prior ruling remains correct with regard to Montana's first exception and that its reasoning is equally applicable to this action. The Court's determination that the plaintiffs have not consented to tribal jurisdiction in the sense required by Montana is not affected by the defendants' contention that tribal jurisdiction is plausible at least as to plaintiff Window Rock USD because that plaintiff's two leases with the Navajo Nation, unlike the leases of the plaintiff school districts in Red Mesa or the lease of plaintiff Pinon USD here, included an agreement to abide by Navajo laws.[11] The Court agrees with the plaintiffs that the Window Rock USD lease does not render tribal jurisdiction plausible over that plaintiff's employment decisions at issue in this action because the NPEA and other tribal statutory provisions on which the employee defendants are basing their claims before the NNLC adversely affect various rights and obligations of public school districts under Arizona law. By way of brief example, Arizona public school districts have the statutory right under Arizona law to have employee grievances resolved

---

[11] The two Window Rock USD leases, which are part of the record of this action, are essentially identical with regard to the provision at issue. The more recent of the two leases, which was entered into in 1985, provides in relevant part:

16. AGREEMENT TO ABIDE BY NAVAJO LAWS

The Lessee and the Lessee's employees, agents, and sublessees and their employees and agents agree to abide by all laws, regulations, and ordinances of the Navajo Tribal Council now in force and effect or may be hereafter in force and effect as long as those laws, regulations, and ordinances do not conflict with state or federal law. This agreement to abide by Navajo laws shall not forfeit rights which the Lessee and the Lessee's employees, agents, and sublessees and their employees, and agents enjoy under the Federal laws of the United States Government, nor shall it affect the rights and obligations of Lessee as an Arizona public school district under applicable laws of the State of Arizona.

under state, not tribal, mandated procedures, which include a requirement for the exhaustion of state law administrative remedies followed by judicial review exclusively through the state court system using state law-mandated burdens of proof (which, as the plaintiffs correctly note, place the burden of proof on appeal on the employee, not on the employer as does Navajo law), and well as the obligation under both state and federal laws not to base their employment decisions on discriminatory grounds. *See e.g.*, Civil Rights Div. of Arizona Dept. of Law v. Amphitheater Unified School Dist. No. 10, 680 P.2d 517 (Ariz.App.1983) (Court applied the anti-discrimination provisions of the Arizona Civil Rights Act to a public school district's employee hiring procedure); Dawavendewa v. Salt River Project Agricultural Improvement & Power Dist., 154 F.3d 1117 (9th Cir.1998) (Court concluded that differential employment treatment based on tribal affiliation by a non-Indian employer on the Navajo Reservation, which resulted from a Navajo employee preference requirement in a tribal lease, was actionable as national origin discrimination under Title VII).

(2) Second Exception

The defendants further argue that tribal court jurisdiction also plausibly exists under the second Montana exception, which is an issue that was not raised in the Court's prior Red Mesa case. This exception provides that a tribe may retain inherent power to exercise civil jurisdiction over the conduct of non-Indians on a reservation "when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Montana, 450 U.S. at 566. The Supreme Court has stated that this exception does not expand tribal jurisdiction "beyond what is necessary to protect tribal self-government or to control internal relations[,]" *id.* at 564, and the Ninth Circuit, noting that "virtually

every act that occurs on the reservation could be argued to have some political, economic, health or welfare ramification to the tribe[,]" has emphasized that this exception must be "narrowly construed" so that the exception does not swallow Montana's presumption of no tribal jurisdiction over non-Indians. County of Lewis v. Allen, 163 F.3d 509, 515 (9th Cir.1998) (*en banc*). In order for this limited exception to be applicable, the specific conduct the tribe wants to regulate "must do more than injure the tribe, it must imperil the subsistence of the tribal community." Plains Commerce Bank v. Long Family Land and Cattle Co., 554 U.S. at 341 (internal quotation marks omitted). In an explanatory comment about the narrowness of this exception, the Supreme Court quoted the statement of one commentator who has noted that "the elevated threshold for the application of the second *Montana* exception suggests that tribal power must be necessary to avert catastrophic consequences." *Id.*

The defendants argue that the Court is not in a position to determine if tribal jurisdiction is plainly lacking under Montana's second exception in the absence of a factual record developed through the tribal court system regarding the impact on the Navajo Nation if tribal law cannot be applied to the employment disputes underlying this action.[12]  The NNLC defendants specifically contend that the information that the NNLC ruled it needed before determining its jurisdiction over the employee defendants' complaints, *e.g.*, information on the demographic makeup

---

[12] The employee defendants have relatedly filed a motion pursuant to Fed.R.Civ.P. 56(f) [sic-56(d)] to permit them to complete the discovery they were undertaking before the NNLC at the time this action was commenced before the Court resolves the plaintiffs' summary judgment motion. The Court concludes that the requested discovery, as described by the employee defendants, is not warranted because its inclusion in the record would not persuade the Court that tribal jurisdiction exists here.

of the school districts' students, employees, and board members, is significant to the issue of whether the tribe's inability to apply its laws to resolve employee complaints imperils its self-government. The Court disagrees.

While the Court accepts that the plaintiffs' employees, students, and board members are primarily Navajos and that the plaintiffs' employment-related decisions have an impact on the Navajo Nation, the Court agrees with the plaintiffs that the defendants cannot make any showing, plausible or otherwise, that the inability of the tribe to regulate and adjudicate the plaintiffs' personnel decisions at issue can "fairly be called catastrophic for tribal self-government." Plains Commerce Bank, 554 U.S. at 341 (internal quotation marks omitted). *See* State of Montana Dept. of Transportation v. King, 191 F.3d 1108, 1114 (9th Cir.1999) (Court concluded in part that Montana's second exception did not provide an Indian tribe with regulatory jurisdiction over a state's employment practices related to a construction project on a reservation highway over which the state had a right of way notwithstanding the court's recognition that the tribe's welfare was harmed by very high levels of unemployment on the reservation.) *See also*, MacArthur v. San Juan County, 497 F.3d at 1075 (In determining that the Navajo Nation had no regulatory or adjudicative authority under Montana's second exception over the employment-related decisions of a health services district, which was a political subdivision of the State of Utah operating within the Navajo Reservation on state-owned land, the Tenth Circuit stated that "[w]hile the Navajo Nation undoubtedly has an interest in regulating employment relationships between its members and non-Indian employers on the reservation, that interest is not so substantial in this case as to affect the Nation's right to make its own laws and be governed by them. ... The right at issue in this case is the Navajo Nation's claimed right to make its own laws and have *others* be

governed by them, not the right to self-government.") (emphasis in original). Furthermore, the lack of tribal jurisdiction over the plaintiffs' employment-related decisions cannot reasonably be said to menace the tribal community because Arizona law provides due process protections to the plaintiffs' employees who wish to contest adverse employment actions. *See* Bugenig v. Hoopa Valley Tribe, 229 F.3d 1210, 1221 (9th Cir.2000) ("[O]ur precedents have stressed the inapplicability of the second *Montana* exception in situations where tribal jurisdiction is not necessary to protect Indian tribes or their members who may pursue their causes of action in state or federal court.") (internal quotation marks omitted). *See also*, Glacier County School District No. 50 v. Galbreath, 47 F.Supp.2d 1167, 1171-72 (D.Mont. 1997) (In determining that an Indian tribe had no authority under the second Montana exception over the operations of a public school district, which was a political subdivision of the State of Montana operating on its fee-owned property located on the Indian reservation, the court reasoned that "[o]nce enrolled in the State of Montana's public school system, tribal members must comply with the procedures established by state law to resolve any resulting grievance or dispute. Opening the Tribal Court for the optional use of tribal members unhappy with the substance or the pace of the proceedings mandated by Montana law is not ... necessary to protect tribal self government.")

Based on the foregoing, the Court concludes as a matter of law that the Navajo Nation has no regulatory or adjudicative jurisdiction over the plaintiff school district's employment-related decisions underlying this action. Since tribal jurisdiction is lacking, the Court agrees with the plaintiffs that the employee defendants should be barred from further prosecuting their employment-related claims before the NNLC or any other the Navajo Nation court or forum and that the

NNLC defendants should be barred from any further adjudication of those claims. Therefore,

IT IS ORDERED that the Navajo Nation Labor Commission Defendants' Motion to Dismiss for Failure to Exhaust Tribal Remedies (Doc. 12) is denied.

IT IS FURTHER ORDERED that defendants Ann Reeves, Kevin Reeves, Loretta Brutz, May Y. John, Clarissa Hale, Michael Coonis and Barbara Beall's Motion Pursuant to Rule 56(f) [sic-56(d)] Fed.R.Civ.P. (Doc. 34) is denied.

IT IS FURTHER ORDERED that Plaintiffs' Cross-Motion for Summary Judgment (Doc. 27) is granted.

IT IS FURTHER ORDERED that defendants Ann Reeves, Kevin Reeves, Loretta Brutz, May Y. John, Clarissa Hale, Michael Coonis and Barbara Beall are enjoined from any further prosecution of their employment-related claims before the Navajo Nation Labor Commission or the Navajo Nation Supreme Court or any other Navajo Nation tribal court or administrative tribunal, and that Navajo Nation Labor Commission defendants Richie Nez, Casey Watchman, Ben Smith, Peterson Yazzie, Woody Lee, Jerry Bodie, and Evelyn Meadows are enjoined from any further adjudication of the employment-related claims of Ann Reeves, Kevin Reeves, Loretta Brutz, May Y. John, Clarissa Hale, Michael Coonis and Barbara Beall.

IT IS FURTHER ORDERED that plaintiffs Window Rock Unified School District and Pinon Unified School District, after consultation with the defendants, shall submit a proposed form of judgment no later than April 30, 2013.[13]  Any objections by the defendants to the proposed form of judgment shall be filed no later

/ / /

---

[13] The plaintiffs shall state in their proposed form of judgment submission whether or not any defendant will object to the proposed judgment.

than May 20, 2013.

DATED this 19th day of March, 2013.

*[signature]*

Paul G. Rosenblatt
United States District Judge